1  JOSEPH P. RUSSONIELLO (44332)
   United States Attorney
2
3  BRIAN J. STRETCH (CSBN 163973)
   Chief, Criminal Division
4
   SUSAN B. GRAY (CSBN 100374)
   Assistant United States Attorney
5
       450 Golden Gate Avenue, 9th Floor
6      San Francisco, CA 94102
       Telephone: 415.436.7324
7      Facsimile:   415.436.6748
       Email: Susan B.Gray@usdoj.gov
8
   Attorneys for United States of America
9

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

   UNITED STATES OF AMERICA,        )
                                    )   No. 07- 5413-MMC
                        Plaintiff,  )
                                    )
            v.                      )   UNITED STATES RESPONSE TO MOTION
                                    )                TO SUPPRESS
   APPROXIMATELY $61,505 IN UNITED  )
   STATES CURRENCY,                 )
                                    )
                        Defendant.  )
   _____)
                                    )
                                    )
   FRANK JOSEPH ALIOTO, JR.         )
                                    )
                        Claimant.   )
   _____)

## TABLE OF CONTENTS

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    The Entire Encounter Between the Agents and Claimant Was A Consensual Encounter and Nothing More; Alioto Was Never Stopped, Detained or Seized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B. The Agents Had Reasonable Suspicion to Detain the Luggage for a Dog Sniff. . . . . 11

           1.    The Agents Exercised Due Diligence In Obtaining A Canine Unit.. . . . . 14

      C. Alioto Gave Voluntary Consent to Search the Bags. . . . . . . . . . . . . . . . . . . . . . . . 15

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

TABLE OF AUTHORITIES

FEDERAL CASES

Beck v. Ohio, 379 U.S. 89 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Florida v. Bostick, 501 U.S. 429, (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Florida v. Roger, 460 U.S. 491 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Schneckloth v. Bustamonte, 412 U.S. 218.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

Terry v. Ohio, 392 U.S. 1 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

United States v. $25,000 U.S. Currency, 853 F. 2d 1501 (9th Cir. 1988). . . . . . . . . . . . . . . . . 10

United State v. Torres, 83 F.3d 1123 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Alpert, 816 F. 2d 958 (4th Cir.1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Attardi, 796 F. 2d 257 (9th Cir. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Avon-Meza, 177 F.3d 1130 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Ayarza, 874 F.2d 647 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

United States v. Ayarza, 874 F.3d 647 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Castillo, 866 F. 2d 1071 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Edwards, 898 F. 3d 1273 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Erwin, 803 F. 2d 1505 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Evans, 27 F.3d 1219 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Holland, 510 F.2d, 453, 455 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Hunnicutt, 135 F. 3d 1245 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Ilazi, 730 F.2d 1120 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Johnson, 910 F.2d 1506 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Kaplan, M.D, 895 F.2d 618 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . 16, 17

United States v. McCarther, 6 F.3d 1270 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Mendenhall, 446 U.S. 544 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

United States v. Odom, 72 F. 3d 1279 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Place, 462 U.S.696. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

United States v. Price, 500 F. 2d 494 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Safirstein, 827 F. 2d 1380 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Scheets, 188 F.3d 829 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Sokolow, 490 U.S. 1 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

United States v. Sterling, 909 F. 2d 1078 (7th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Velarde, 823 F. Supp 792 (D. Hawaii 1992). . . . . . . . . . . . . . . . . . . . . . . 10, 12

United States v. West, 731 F 2d 90 (1st Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Woods, 720 F.2d 1022 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

United States v. Yusuff, 96 F.3d 982 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

United States v. Zukas 843 F 2d 179 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v, Matau, 191 F. Supp. 2d 1173 (D. Hawaii 2002). . . . . . . . . . . . . . . . . . . . . . . . . 8

United v. Black, 675 F 2d 129, 137 (7th Cir.1982); cert. denied, 460 U.S. 1068 (1982). . . . . . . 13

FEDERAL STATUTES

21 U.S.C. §801.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21 U.S.C. §881(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FEDERAL RULES

Rule G of the Suppl. Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions . . . . 2

9th Cir. 1989. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

The United States of America respectfully submits the following response to Claimant Frank Joseph Alioto, Jr.'s Motion to Suppress Evidence.

## I. INTRODUCTION

The United States filed a verified civil forfeiture complaint against $61,505 in United States Currency (hereinafter referred to as the "defendant funds") alleging that it was furnished or intended to be furnished in exchange for a controlled substance, was the proceeds from the sale of a controlled substance, or was used or intended to be used to facilitate a violation of the Controlled Substance Act, 21 U.S.C. §801, et seq., and was therefore, subject to forfeiture pursuant to 21 U.S.C. §881(a)(6). Claimant Frank Joseph Alioto, Jr. ("Alioto") moved to suppress evidence obtained from the "detention and search of [his] bag."[1] The uncontradicted evidence set forth below demonstrates that Alioto had a consensual encounter with agents, the agents had sufficient articulable facts to detain Alioto's bag for a drug dog sniff. The detention was reasonable in time and location, and supported by reasonable suspicion. Thereafter, Alioto consented to a search of his bag.

## II. STATEMENT OF FACTS[2]

On or about May 29, 2007, Special Agent Willie Byrd of the Drug Enforcement Administration received detailed information from a confidential informant regarding suspicious travel by Alioto. (Declaration of Special Agent Willie Byrd, filed herewith, ¶2. All subsequent factual citations are to Agent Byrd's Declaration unless otherwise noted.) He was informed of the following: Alioto was returning on a round trip return flight from Atlanta, Georgia, to San Francisco International Airport ("SFO") on Delta Airlines Flight #611 with no checked luggage. ¶2

Alioto was originally scheduled to travel to Atlanta on May 25, 2007, and return to San

---

[1] Although Alioto alleges at one point that he is objecting to the seizure and search of his person and his luggage, (Opening Brief at p.7, l.3) thereafter his brief addresses only the search of his bag. There is nothing in the record before this Court to indicate that anything was taken from Alioto's person. The defendant $61,505 was found in his bags.
In responding to this Motion to Suppress the United States does not waive any challenges to the sufficiency of the Claim filed by Alioto under Supplemental Rule G(5)(a)(i), G(5)(a)(i)(B) and (c) and Northern District General Order 45, X.B.

[2] Alioto's opening brief makes mention of the agents' reports in this case, but he did not submit them as exhibits to his motion. The only facts before this court are those contained in the verified complaint and the attached Declaration of Special Agent Willie Byrd.

Francisco on May 28, 2007. ¶3  He made the reservation on May 24 and paid approximately $1,900.00 in cash for the first class ticket. ¶3  While in Atlanta, Alioto changed his return flight three times. ¶3  On May 27, 2007, the day before his May 28 scheduled return, Alioto changed his itinerary to return to San Francisco on Delta Airlines Flight # 611 which was due to arrive on May 30, 2007, at approximately 12:56 p.m.[3] ¶3  Agent Byrd also learned that Alioto had an extensive travel history of round trips to and from Atlanta from the Bay Area. ¶3.  Alioto usually paid cash for a first class ticket and had a quick turn around time. ¶3  In addition, Alioto had a documented incident with a Delta Airline front counter agent which took place in June 2006. ¶3  When the front counter agent had informed Alioto that he would have to check his luggage because it was oversized, Alioto stated that the luggage was a carry-on and requested to speak with a supervisor. ¶3  The supervisor told Alioto that the luggage was oversized and would have to be checked at no extra charge. ¶3  Alioto then pulled the front counter agent to the side and attempted to bribe the front counter agent with a one hundred dollar bill. ¶3

      Agent Byrd also knew, based on his training and experience, that Atlanta, Georgia is known as a drug hub; a city to which drugs may be transported from source cities before subsequent distribution.[4] ¶4

      Prior to Alioto's arrival Agent Byrd conducted a check of a commercial database and a ran a NCIC check on Alioto. ¶5  The commercial data base search revealed where Alioto resided and gave his California drivers license number. ¶5  The NCIC check revealed that Alioto was a white male, 5'11" tall, weighing 185 pounds, with brown hair, hazel eyes and was born on October 21, 1977. ¶5  NCIC records further revealed that Alioto has seven prior drug arrests and three drug convictions. ¶5   He had a misdemeanor conviction in Sacramento for possession of a controlled substance in 2003; he was sentenced to 36 months probation and 90 days jail. ¶5  He had a misdemeanor conviction in Fulton County, Geogia for possession of marijuana in 2005 and

---

[3] The flight was originally scheduled to arrive at 1:16 p.m., but it arrived twenty minutes early at 12:56 p.m.

[4] A copy of the United States Department Intelligence Center, National Drug Threat Assessment report identifying Atlanta as a "significant drug distribution hub" which was supplied to claimant as part of discovery is attached to Agent Byrd's declaration as Exhibit A.

was sentenced to 12 months with credit for time served.  ¶5  Alioto also had a misdemeanor conviction in Lancaster, Texas in 2005 for possession of marijuana (less than two ounces) for which he was held for an undetermined amount of time.  ¶5

Agent Byrd also learned that on May 26, 2007, Alioto was arrested in Myrtle Beach, South Carolina for operating an unregistered vehicle, no proof of ownership, no valid driver's license and speeding.  ¶6  Alioto posted bond in the amount of $668.00 in cash.  ¶6  At the time of his arrest Alioto had in his possession a total of $2,731.00 in cash.  ¶6  Alioto listed his employer or occupation as a family restaurant.  ¶6

On May 30, 2007,  Delta Airline flight #611 arrived at gate C40 at approximately 12:56 p.m.  ¶7  Agent Byrd and other agents  from DEA Task Force 2 observed Alioto deplane.  ¶7  He was the second passenger to exit Gate C40.  ¶7  Alioto was carrying a brown leather gym bag and a small rolling bag.  ¶7  The agents maintained foot surveillance as Alioto went through the secured check point exit,  proceeded through the baggage claim area and out the airport doors to the Delta Airlines curbside pick-up area.  ¶7  The agents did not stop Alioto at the gate, because they wanted to ascertain if he was meeting anyone or had checked a bag they did not know about. ¶7

Two agents, Agent Byrd  and Task Force Agent ("TFA") Steve Maes approached Alioto from behind and identified themselves by showing their law enforcement identification, which contained their photos.  ¶8   They were dressed in casual clothing, not in uniform, and they did not display any weapons.  ¶8  There were several other plainclothes agents in the area, but they did not approach Alioto or make themselves known to him.[5]   ¶8  Agent Byrd advised Alioto that he was not under arrest and was free to go.  ¶8  TFA Maes asked Alioto if he would answer some questions and Alioto said "yes, but my ride will be here shortly."  ¶8   Agent Byrd asked Alioto for identification and Alioto provided a California drivers license, which Agent Byrd examined and returned.  ¶8  TFA Maes asked Alioto about his travel itinerary.  ¶8  Alioto stated that he had flown in from Atlanta, Georgia.  ¶8  He said he had flown to Atlanta on May 25th and then on to

---

[5] They were there for surveillance purposes and agent safety.

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                                      3

Myrtle Beach, South Carolina for the "Black Motorcycle Weekend" on May 26th and returned to Atlanta on May 28th. ¶8  He did not mention that he had changed his travel plans three times. ¶8  Alioto appeared nervous and his hands were shaking. ¶8

     TFA Maes asked Alioto if he currently had illegal drugs or a large amount of U.S. Currency in his possession. ¶9  Alioto stated that he had approximately $25,000.00 U.S. Currency in his luggage. [6] ¶9  Alioto then spontaneously told the agents that his grandfather was a former mayor of San Francisco, and that his mother was named Joan and he had an aunt named Angela. ¶9  This surprised the agents, because they had not asked any questions about his family or political connections. ¶9

     At approximately 1:09 p.m., a silver 750i BMW with paper tags parked curbside in front of Alioto. ¶10  Alioto said the BMW was his ride home. ¶10  TFA Maes asked Alioto for consent to search his luggage for U.S. currency or illegal narcotics. ¶10  Approximately 5 minutes had elapsed between the time the Agent Byrd and TFA Maes approached Alioto and the time the agents requested consent to search the bag. ¶10  Alioto declined, stating that he was late and his ride was there. ¶10  Agent Byrd explained to Alioto that the officers had a reasonable suspicion to believe the luggage contained narcotics or currency that was proceeds of narcotics transactions. ¶10  Agent Byrd again told Alioto that he was still free to go, but that the agents were temporarily detaining the two pieces of luggage so that a trained narcotics canine could check out the luggage and if the dog alerted the agents would seek a search warrant. ¶10  Alioto stated "Go get the dog." ¶10

     TFA Maes approached the driver of the BMW and explained that Alioto was not under arrest and was not in any trouble. ¶11  When the driver asked how long the canine dog check would take, TFA Maes explained that it should take about 5 minutes. ¶11  When asked for his name the driver was reluctant, stated "Joe" and refused to give his last name. ¶11  The driver stated that he wanted to find a parking space for the BMW and wait until Alioto was through. ¶11

---

[6] Alioto was later found to have approximately $61,000. ¶21

1  The driver, later identified as Jonas Teele, drove away. ¶11  He did not return.[7]  ¶ 11

2       Agent Byrd called TFA Marty Mahon to respond to the location with his certified
3  narcotics detection canine, "Maximus." ¶12  Agent Byrd knew that TFA Mahon and Maximus
4  were out of sight inside the baggage area less than 50 feet behind him. ¶12  Earlier in the day
5  Agent Byrd had requested that TFA Mahon and Maximus be in close proximity and on call in the
6  event their services were needed. ¶12

7       In less than 5 minutes TFA Mahon and Maximus approached the curb sidewalk area
8  where Agent Byrd, TFA Maes, and Alioto were standing with Alioto's bags. ¶12  Maximus
9  alerted to the two luggage pieces by barking and scratching which indicated to TFA Mahon that
10  the odor of narcotics was emanating from the luggage. ¶12  "Maximus" is certified to detect
11  heroin, cocaine, marijuana and methamphetamine. ¶12  TFA Mahon has handled and trained
12  "Maximus" since May of 2001. ¶12  "Maximus" has successfully located drugs over 300 times in
13  past cases and training. ¶12

14       After Maximus alerted to the luggage, Alioto said that the dog had alerted because "legal
15  marijuana" was previously carried inside of the luggage. ¶13  When asked if he had a medical
16  cannabis card, Alioto replied "no." ¶13

17       Agent Byrd asked Alioto if agents could search his luggage. ¶14  Alioto replied "Go
18  ahead and search the bags. ¶14  There aren't any drugs in it." ¶14  Agent Byrd searched the
19  luggage pieces while TFA Maes interviewed Alioto. ¶14

20       Alioto told TFA Maes that he currently owns a record company with Jonas Teele called
21  Wash House Records and that he makes approximately $10,000.00 to $15,000.00 a month from
22  the company. ¶15  Alioto said he sold "five beats" to Lil Jon and "five beats" to Lil Jon's
23  associates. ¶15  He was unable to provide contact numbers or names for anyone to whom he had
24  sold "beats." ¶15  He refused to state the price of the "beats", stating "the amount of the beats
25  varies." ¶15  When asked which financial institution he used, Alioto stated that he did not have a

---

[7] Following the consensual encounter Agent Byrd learned that Alioto took a cab from the airport. Jonas Teele did not return for Alioto. The cab driver stated that Alioto was very nervous and requested to be dropped off in Oakland. The cab driver feared that he would be "stiffed" on the fare and denied the request. Alioto then requested to be dropped off anywhere in downtown San Francisco. Alioto did not ask to go to a radio station. ¶11, fn. 4

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                        5

bank account and did not believe in banks. ¶15  Alioto stated that he planned to keep the currency he had at his mother's residence. ¶15  When asked if he had ever been arrested, Alioto stated that he had only been arrested for vandalism and "this weekend for a suspended DL". ¶15  He did not tell the agents about his seven prior drug arrests, or three drug convictions.  ¶15

     Agent Byrd's search of the bags revealed the following: In the main compartment of the leather gym bag he found a white plastic bag which contained numerous large bundles of rubber banded United States Currency,  a pair of tennis shoes with one large rubber banded bundle of U.S. Currency in each shoe and a grey tennis shoe bag that contained a pair of tennis shoes and two large bundles of U.S. Currency bound together with rubber bands. ¶16

     While searching the main compartment of the small brown rolling bag, Agent Byrd observed two Western Union customer receipts which showed that on May 29, 2007, Alioto made a $500.00 payment on account number ************9108 to Capitol One Car Services in Capone, Virginia. ¶17  On the same date, Alioto made a $700.00 payment on account number ************7515 to Orchard Bank HSBC in Cloud, Oregon.  ¶17

     Agent Byrd continued to search the main compartment of the rolling bag and found multiple large bundles of U.S. Currency bound together with rubber bands.  In a pair of tan pants he also found multiple large bundles of U.S. Currency bound together with rubber bands inside both front pockets of the tan pants.  ¶18

     TFA Maes told Alioto that he was going to seize the currency pending further investigation. ¶19  Alioto was given a receipt for the money and left the airport in a taxi. ¶19 The entire consensual encounter with Alioto had lasted less than approximately 30 minutes.  ¶19

     Agent Byrd and TFAs Mahon and Maes walked back to their offices in another terminal and at approximately 1:45 p.m. TFA Mahon had his certified narcotic detection canine, "Maximus," examine defendant $61,505. ¶20  During a systematic search of an area where the currency had been secreted,  "Maximus" alerted to the currency, which indicated the odor of narcotics emanating from it.  ¶20

     The denominations of the defendant $61,505 were: 2040 x $20 dollar bills; 1798 x $10 dollar bills; 545 x $5 dollar bills. ¶21  The packaging and denominations of defendant $61,505

are consistent with those used for, or from, the sale of illegal controlled substances. ¶21

///

### III. ARGUMENT

In his motion to suppress, Alioto asserts that he and his luggage were detained and searched, without a warrant, and in violation of the Fourth Amendment to the United States Constitution, thus necessitating the suppression of all evidence seized during the search of his bag. The uncontradicted facts before this court establish just the opposite: 1) Alioto's entire encounter with the agents was consensual-Alioto was never detained in any way and Alioto was repeatedly told he was free to go, 2) the less than 5 minute detention of Alioto's bag to wait for a dog sniff was based on reasonable suspicion, and 3) after the dog alerted to his bag, Alioto gave the agents consent to search the bag. For these reasons, set forth more fully below, this Court should reject Alioto's arguments and deny his motion to suppress.

**A. The Entire Encounter Between the Agents and Claimant Was A Consensual Encounter and Nothing More; Alioto Was Never Stopped, Detained or Seized**

Before the court analyzes whether a search or seizure is reasonable or unreasonable, there must first be a "search" or a "seizure". <u>United States v, Matau</u>, 191 F. Supp. 2d 1173, 1180. (D. Hawaii 2002). A consensual encounter with an officer is not a seizure of a person" that implicates Fourth Amendment protection. *Id.* citing <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980).

As noted above, the two law enforcement agents approached Alioto while he was standing in a public place and asked him if he would be willing to answer a few of their questions.[8] Defendant voluntarily agreed to have a conversation with the agents. He was told that he was free to go. The agents were not in uniform, displayed no weapons, did not block his path, retain his

---

[8]The agents did not stop Alioto at the gate because they wanted to ascertain if he was meeting anyone or had checked a bag they did not know about. This action was entirely appropriate. <u>United States v. West</u>, 731 F 2d 90, 93 (1st Cir. 1984). (agents watched defendant for 10 minutes before approaching him to see if he was meeting with confederates)

identification or limit his freedom of movement in any way.  These types of consensual encounters between law enforcement officers and citizens take place every day on buses, street corners, and airports.  The courts have ruled that consensual questioning of private citizens is a vital law enforcement tool.  As the Supreme Court noted: "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved.  In short, the security of all would be diminished."  United States v. Mendenhall, 446 U.S. 544 (91980) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 ((1973).  Such consensual questioning "intrudes upon no constitutionally protected interest," *id*. at 552, and thus is not the proper subject of a motion to suppress. [9]  The standard for determining whether or not a consensual encounter occurred is an objective one, articulated in Mendenhall, *supra*, as follows: whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." 466 U.S. at 554, 555.

      As noted above, the consensual encounter was brief in nature, the entire conversation, including the dog sniff and subsequent search of the bag, lasted less than 30 minutes.  Furthermore, there was nothing wrong about the questions the agents posed during the interview.  The queries themselves were permissive and non-coercive.  The matters inquired into, i.e. requesting to see identification, travel itinerary, and whether Alioto was carrying any money or contraband, were hardly remarkable.[10]

---

[9] The Supreme Court has developed three categories for police-citizen encounters in relation to the Fourth Amendment.  The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed a crime.  Beck v. Ohio, 379 U.S. 89 (1964).  The second is an investigatory stop, which is limited to a brief, non-intrusive detention.  This is also a Fourth Amendment "seizure", but the officer need only have specific and articulate facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime, Terry v. Ohio, 392, U.S. 1, (1968).  The third category involves no restraint on a citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning.  This is not a seizure within the meaning of the Fourth Amendment.  United States v. Mendenhall, 446 U.S. 544 (1980).

[10] This was particularly true in light of Alioto's prior 7 drug arrests.

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                                   8

///

The agents initial approach and interview with Alioto was nothing more than a consensual encounter, as explained by the Ninth Circuit in United States v. Woods, 720 F.2d 1022, 1026 (9th Cir. 1983) as follows:

> Law enforcement officers do not violate the Fourth Amendment by approaching an individual in a public place and putting questions to him or her. The person so questioned need not answer any questions and is legally free to ignore the officer or walk away. His or her voluntary answers to the officer's questions are admissible in a criminal prosecution. The fact that the officer identifies himself as a police officer does not 'convert the encounter into a seizure requiring some level of objective justification.' Florida v. Roger, 460 U.S. 491 (1993)[11]

*Accord,* Florida v. Bostick, 501 U.S. 429, 436, (1991); United States v. Avon-Meza, 177 F.3d 1130, 1133 (9th Cir. 1997); United States v. $25,00 U.S. Currency, 853 F. 2d 1501, 1505 (9th Cir. 1988); United States v. Velarde, 823 F. Supp 792 (D. Hawaii 1992), *af'fd.*, 25 F.3d 848 (9th Cir. 1994).

The consensual nature of this encounter did not change when the officers asked to search Alioto's bag or when the agents told him that they were going to detain his bag for a dog sniff. As the Supreme Court recognized in Florida v. Bostick, *supra* at 436, "No seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage–so long as the officers do not convey a message that compliance with their requests is required." *See also*, Florida v. Bostick, *supra*, 436 (1991); United States v. Odom, 72 F. 3d 1279, 1283 (7th Cir. 1995). (an agent's non-threatening request to search the individual's luggage will not convert a consensual interview into an investigatory stop.); United States v. Johnson, 910 F.2d 1506, 1509 (7th Cir. 1990) (no need for Terry "reasonable suspicion" analysis when agents who detained bags told defendant that she could refuse to consent to dog sniff and she was free to go; no Fourth Amendment rights were implicated in consensual

---

[11] *See also*, United States v. Safirstein, 827 F. 2d 1380, 1383 (9th Cir. 1987); United States v. Ayarza, 874 F.3d 647, 650-1, (9th Cir. 1989) (Trooper's sidewalk interview of defendant outside of airport terminal, which included a request for and examination of defendant's license, inquiries as to the purpose of defendant's prior travel, and the Trooper's advising defendant that a drug investigation was being conducted , only constituted a consensual encounter.)

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                                9

encounter)

In the instant case Alioto was told at the outset that he was free to go at any time. When the agents asked for consent to search his bags, and he refused, he was told again that he was free to go. The agents told him they were going to briefly detain the bags and if the dog alerted on the bags, they would seek a search warrant. They did not threaten him, block his path or retain his identification; in fact, they reiterated that he was free to leave and that they were only detaining the bags. This is not the kind of situation that disrupted Alioto's travel plans. He had no plane to catch; he lived in the area. When his ride, Jonas Teele arrived, the agents informed Teele that the wait would be only about 5 minutes. The fact that Alioto decided to stay for the dog sniff did not change the fact that he was then, and at all times thereafter, free to leave at any time. A reasonable person in Alioto's position would have felt free to leave, decline to answer Agent Byrd's questions, or otherwise terminate the encounter. *See*, United States v. Mendenhall, 446 U.S. at 555.

Perhaps most telling in evaluating this argument is that Alioto has not even alleged that he believed he was not free to leave. He has filed no declaration to that effect. In this case, despite defendant's half-hearted attempt to characterize his encounter with the agents as a seizure, the uncontradicted facts reflect that the entire encounter between the agents and Alioto was consensual.

Finally, even if this Court were to find that the agents' detention of Alioto's bag somehow elevated Alioto's consensual encounter to a Terry stop, such a limited stop of Alioto is supported by the totality of the circumstances known to the agents at the time they detained the bag, as shown below.

**B. The Agents Had Reasonable Suspicion to Detain the Luggage for a Dog Sniff**

The agents had sufficient articulable facts to detain Alioto's bag for a dog sniff. This detention was reasonable in time and location, and supported by reasonable suspicion.

In United States v. Place, 462 U.S.696, the United States Supreme Court held that when an officers's observations lead him to reasonably believe that a traveler is carrying luggage that contains narcotics, the principles of Terry v. Ohio, 392 U.S. 1 (1968) and its progeny permit the officer to detain the luggage temporarily to investigate the circumstances that aroused the agents

suspicion. *Id.*[12] The temporary detention must be supported by reasonable suspicion based on the "totality of the circumstances." United States v. Place, *supra* at 703. That "totality" includes the agent's experience, prior acquired investigative knowledge about the suspect and the behavior of the suspect. United States v. Ayarza, 874 F.2d 647, 652 (9th Cir. 1989); United States v. Sterling, 909 F. 2d 1078, 1083-1084 (7th Cir. 1990). In making the reasonable suspicion determination, "[t]he courts afford considerable deference to the observations and conclusions of trained officers, reasoning that they are able to infer criminal activity from conduct that seems innocent to the trained observer," United States v. Velarde, 823 F. Supp. 792, 798 (D.C. Hawaii 1993), *aff'd*., 25 F.3d 848 (9th Cir. 1994), *accord,* United States v. Woods, 720 F. 2d 1022, 1027 (9th Cir. 1983).

When the agents detained Alioto's bag for a dog sniff, they had the following information gleaned from their pre-arrival research and investigation, their surveillance and during their consensual interview:

1. Alioto had 7 prior arrests involving drugs, three of them resulting in convictions.[13]

2. Alioto was returning from a round trip from a drug hub city.[14]

3. He had purchased his first class ticket with cash, the day before travel.[15]

4. His original return reservation was for a quick turn around, but he changed the return reservation three times, the last time just the day before travel.[16]

4. Alioto had an extensive travel history of round trips to and from Atlanta from the Bay

---

[12] The Court also held that the investigative procedure of subjecting luggage to a "sniff test" by a well-trained narcotics detection dog does not constitute a "search" within the meaning of the Fourth Amendment. *Id.* at 698

[13] One of those convictions, for possession of marijuana, was in Georgia.

[14] See, Exhibit A attached to Declaration of Special Agent Willie Byrd.

[15] United State v. Sokolow, 490 U.S. 1, 8-10, (1989)(paying cash for ticket a part of reasonable suspicion analysis); Florida v. Royer, 460 U.S. 491, 502 (1983); United States v. McCarther, 6 F.3d 1270, 1277 (7th Cir. 1993) (ticket purchased with cash supports finding of illegal drug conduct); United States v. Edwards, 898 F.3d 1273, 1277 (7th Cir. 1990)(ticket purchased with cash supports reasonable suspicion for Terry stop.)

[16] The last minute reservation and numerous changes to his departure time belie Alioto's unsupported allegation that this was a pleasure trip. The multiple reservations are counter-indicative of vacation travelers who normally plan their trips out to save money.

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                                    11

Area, and he usually paid cash for a first class ticket and had a quick turn around time.[17]

5.  Alioto had no checked luggage.[18]

6.  Alioto was nervous and shaking when he spoke with the agents.[19]

7.  Alioto had previously tried to bribe an airline employee when he was told he would be separated from his carry-on luggage and the luggage must be checked.

8.  Alioto admitted to carrying $25,000 in cash.[20]

9.  Immediately after admitting he was carrying $25,000 in cash, Alioto informed the agents of his political connections.[21]

Alioto argues that some of these factors, traveling to a drug hub city, paying for his ticket in cash, no checked luggage, prior drug convictions, and traveling under his own name[22] were not

---

[17] *See e.g.,* Sokolow v. United States, 490 U.S. 1,8-10, (1989), Low, 887 232, 235-236 (9th Cir. 1989), United States v. Erwin, *supra*, 803 F.2d at 1506-07; United States v. Ayarza, 874 F.2d 647, 652 (9th Cir. 1989). (recognizing that short turnaround trips can give rise to reasonable suspicion and probable cause)

[18] United State v. Sokolow, 490 U.S. 1, 8-10, (1989)(traveler's failure to check luggage a part of reasonable suspicion analysis).

[19] A defendant's non-verbal but otherwise incriminatory actions may properly be used to establish probable cause and reasonable suspicion. United State v. Sokolow, 490 U.S. 1, 8-10, (1989)(traveler's nervousness a part of reasonable suspicion analysis); United States v. Alpert, 816 F. 2d 958 (4th Cir.1987) (agents may take note when defendant starts to sweat heavily when asked for permission to search briefcase); United States v. Hunnicutt, 135 F. 3d 1245 (10th Cir. 1998)(nervousness by itself, not sufficient to create reasonable suspicion, but there are circumstances in which nervousness contributes to reasonable suspicion); United States v. Zukas 843 F 2d 179, 182-3 (5th Cir. 1988), *cert. denied*, 490 U.S. 1019 (1989) (holding plane passenger's nervousness contributed to reasonable suspicion.)

[20] Alioto makes much of the fact that he told the agents he was carrying money as proof of his truthfulness, but he did not tell the agents the truth. He was actually carrying $61,000 in cash, not $25,000. Agents do not have to take everything an individual says at face value. They are allowed, indeed required, to consider the totality of the circumstances. In this case, they did just that.

[21]This raised Agent Byrd's suspicions that Alioto was trying to seek preferential treatment or deflect further scrutiny based on his political connections.

[22] Reasonable suspicion is not negated because a defendant travels under his own name. United States v. Ayarza, *supra,* at 652.

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                        12

incriminatory, in and of themselves. However, this is not the proper test. The courts have consistently rejected such a piece meal approach. As the Seventh Circuit noted in United v. Black, 675 F 2d 129, 137 (7th Cir.1982); *cert. denied*, 460 U.S. 1068 (1982), "The applicable standard in determining the propriety of a Terry stop is not whether the defendant's actions can be construed as innocent through the exercise of exegetical speculation, but rather whether they give rise to an articulable, reasonable suspicion of criminal activity. *Accord*, United States v. Holland, 510 F.2d, 453, 455 (9th Cir. 1975), *cert. denied*, 94 S. Ct. 2634; United States v. Price, 500 F. 2d 494, 502 (2d Cir. 1979); United States v. Ilazi, 730 F.2d 1120, 1125 (8th Cir. 1984). This is also the standard in the Ninth Circuit. In United States v. Ayarza, the Ninth Circuit, 874 F.2d at 652, the court found that reasonable suspicion cannot be reduced to a neat set of rules, but depends solely on the totality of the circumstances. The factors known to the agents are not to be viewed individually, but collectively. *Id*. "Therefore, we need not dispute counsel's argument that each factor known to [an agent], if viewed alone, was consistent with wholly innocent activity. We concluded instead that these factors, viewed collectively support a finding that [the agent] had reasonable suspicion to believe that Appellant was transporting narcotics. *citing* Sokolow, 490 U.S. 490 U.S. 1 at 9 (although none of the factors "by itself is proof of any illegal conduct,""taken together they amount to reasonable suspicion.")."

In the instant case, even assuming *arguendo* that some of Alioto's actions viewed alone may have been consistent with wholly innocent activity, when taken together, all of the factors known to the agents support the agent's reasonable suspicion that Alioto was involved in drug activity.[23] Particularly troubling is Alioto's prior attempt to bribe the airline counter agent when told he had to check his carry on bag. It is troubling for two reasons, the first is that it indicates he did not want to lose control of his carry-on luggage, but moreover, he was willing to resort to bribery to achieve his goal.

### 1. The Agents Exercised Due Diligence In Obtaining A Canine Unit

Finally, Alioto's argument that the evidence must be suppressed because the agents had not prearranged for a timely dog sniff (Alioto Op. Brief at 20-23) is contradicted by the

---

[23] As the Supreme Court noted in Sokolow, 490 U.S. at 9 (innocent behavior will frequently justify the agent's reasonable suspicions that criminal activity is afoot)

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                    13

1   undisputed facts of this case.
2       The agents followed Alioto through the airport to see if he was going to meet anyone or
3   pick up another bag. Agent Byrd had already notified TFA Mahon that he and his canine unit
4   might be needed. They were out of sight and within 50 feet of Alioto and the agents during the
5   consensual counter. When Agent Byrd called him, TFA Mahon and Maximus were on the scene
6   in less than 5 minutes, probably less than 2 minutes. The agents did just what the courts have
7   advised them to do and what Alioto claims they should do: they prearranged for a canine unit to
8   be standing by, within 50 feet of their initial contact with Alioto. The dog sniff took less than 5
9   minutes. Moreover, Alioto's entire consensual encounter took less than 30 minutes.
10      The 5 minutes it took for the dog sniff are well within the allowable time limits for an
11  investigative detention in the airport context. *See, e.g.* United States v. Attardi, 796 F. 2d 257,
12  259 (9th Cir. 1986) (11 -15 minutes to wait for dog sniff was not unreasonable); United States v.
13  Erwin, 803 F.2d 1505, 1509 (9th Cir. 1986) (45 minutes from time defendant stepped off plane to
14  time dog alerted on bag, was reasonable); United State v. West, 731 F.2d at 93 (when dog at the
15  airport and could be obtained in no more than 20 minutes, agents preparedness was reasonable;
16  failure to have dog at airport gate did not constitute a lack of due diligence)
17      **C. Alioto Gave Voluntary Consent to Search the Bags**
18      As demonstrated above, the uncontroverted facts establish that Alioto voluntarily gave the
19  agents consent to search his luggage. Thus, there was no need for them to seek a warrant.
20      Prior to detaining Alioto's bag for the dog sniff, Agent Byrd told Alioto that if the dog
21  alerted to the bags, the agents would seek a search warrant for the bags. Upon seeing the dog alert
22  Agent Byrd asked Alioto for consent to search the bags. Alioto said "Go ahead and search the
23  bags. There aren't any drugs in it."
24      In order to evaluate whether the consent to search was voluntary, this Court should
25  determine whether defendant's will was "overborne by the police actions." United States v.
26  Yusuff, 96 F.3d 982, 985 (7th Cir. 1996). The factors to be considered in determining whether a
27  consent was voluntary include: "1) whether the encounter occurred in a public place; (2) whether
28  the suspect consented to speak with the officers; (3) whether the officers informed the individual
    that he was not under arrest and was free to leave: (4) whether the individuals were moved to

another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived defendant of documents [he] needed to continue on his way; and (7) whether the officers' tone of voice was such that their request would likely be obeyed." *Id.* At 985-86.  The Ninth Circuit has also noted the following factors should be considered in evaluating the voluntariness of a consent to a search: whether the defendant was in custody; whether the officers had their guns drawn, whether Miranda warnings were given before the consent; and whether the officer claimed that they could obtain an search warrant. United State v. Torres, 83 F.3d 1123, 1129 (9th Cir. 1996); citing United States v. Castillo, 866 F. 2d 1071, 1982 (9th Cir. 1988).  No one factor is dispositive and the fact that some of the factors are not established "does not automatically mean that consent was not voluntary." Torres-Sanchez, 83 F.3d at 1130, Castillo, 866 F.2d at 1082.

In this case, the totality of the circumstances demonstrate that the defendant voluntarily gave the agents consent to search his bags.  Alioto had twice been told he was free to go.  He has not alleged in his motion that he at any time refused to speak with the agents, that the agents either displayed their weapons or used physical force, or that the agents used a harsh or menacing tone of voice.  The search of the bags took place right on the curb; he and the bags were not directed to an interview room or a private area of the airport.  The agents had not retained his drivers licence or travel documents.  When his ride arrived, the agents let the driver know the delay would be no more than 5 minutes. Alioto was not in custody at the time he consented to the search.[24]  Nor does Agent Byrd's statement that if the dog alerted they would seek a search warrant, invalidate the consent.  United States v. Kaplan, M.D, 895 F.2d 618, 622 (9th Cir. 1990).

Second, it is clear that from defendant's own actions that he was hardly ignorant of his rights to refuse consent.  In fact, his earlier refusal to grant consent, prior to the dog alerting on his bag provides a meaningful context within which to analyze his ultimate decision to give the agents consent to search.  *See*, Schneckloth v. Bustamonte, 412 U.S.218, at 227 (1973) ("knowledge of the right to refuse consent is one factor to be taken into account" in the

---

[24] Miranda warnings were therefore unnecessary before the search. United States v. Matau, 191 F. Supp, 2d 1173, 1184 (D.Hawaii 2002)(citing Torres-Sanchez, *supra* at 1130) (Miranda warnings unnecessary when defendant not in custody).

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                                  15

1  voluntariness inquiry.) He was clearly aware of his right to refuse consent throughout his entire
2  consensual encounter with the agents.  However, he clearly decided to change his mind once he
3  had seen the dog alert to the bags.  He knew then that the agents would attempt to seek a warrant
4  for the bags.[25]  When Agent Byrd asked him again, he agreed because he knew there were no drugs
5  in the bag.  He said, "Go ahead and search the bags.  There aren't any drugs in it." This act,
6  coupled with his obvious understanding of his right to refuse consent, manifested a clear intention
7  to provide the agents with consent to examine his luggage.

### IV. CONCLUSION

For the foregoing reasons, claimant Alioto's motion to suppress evidence should be denied.

DATED: July 18, 2008                    Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


        /S/
SUSAN B. GRAY
Assistant United States Attorney

---

[25] A voluntary consent to search is not tainted if agents inform a defendant they will secure a search warrant if the defendant does not consent. United States v. Kaplan, M.D, 895 F.2d 618, 622 (9th Cir. 1990); United States v. Scheets, 188 F.3d 829, 836 (7th Cir. 1999); United States v. Evans, 27 F.3d 1219, 1231 (7th Cir. 1994).

U.S. Opposition to Motion to Suppress
No. 07-5413 MMC                              16