JOSEPH P. RUSSONIELLO (44332)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

SUSAN B. GRAY (CSBN 100374)
Assistant United States Attorney

    450 Golden Gate Avenue, 9th Floor
    San Francisco, CA 94102
    Telephone: 415.436.7324
    Facsimile:  415.436.6748
    Email: sgray2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>             Plaintiff, <br>     v. <br> APPROXIMATELY $61,505 IN UNITED STATES CURRENCY, <br>            Defendant. <br> FRANK JOSEPH ALIOTO, <br>            Claimant. | No. 07- 5413-MMC <br><br> DECLARATION OF SPECIAL AGENT WILLIE BYRD IN SUPPORT OF UNITED STATES' RESPONSE TO MOTION TO SUPPRESS |

I, Willie Byrd, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration Task Force, United States Department of Justice, and I am the case agent for the above entitled case.

2. On or about May 29, 2007, I received detailed information from a confidential informant regarding suspicious travel by Frank Joseph Alioto, Jr. ("Alioto"). I was informed of the following: Alioto was returning on a round trip return flight from Atlanta, Georgia, to San Francisco International Airport ("SFO") on Delta Airlines Flight #611 with no checked luggage.

3. I was also informed that Alioto was originally scheduled to travel to Atlanta on May 25, 2007, and return to San Francisco on May 28, 2007. He made the reservation on May 24 and paid approximately $1,900.00 in cash for the first class ticket. While in Atlanta, Alioto changed his return flight three times. On May 27, 2007, the day before his May 28 scheduled return, Alioto changed his itinerary to return to San Francisco on Delta Airlines Flight # 611 which was due to arrive on May 30, 2007, at approximately 12:56 p.m.[1] The CI also told me that Alioto had an extensive travel history of round trips to and from Atlanta from the Bay Area. Alioto usually paid cash for a first class ticket and had a quick turn around time. In addition, the CI told me that Alioto had a documented incident with a Delta Airline front counter agent which took place in June 2006. When the front counter agent had informed Alioto that he would have to check his luggage because it was oversized, Alioto stated that the luggage was a carry-on and requested to speak with a supervisor. The supervisor told Alioto that the luggage was oversized and would have to be checked at no extra charge. Alioto then pulled the front counter agent to the side and attempted to bribe the front counter agent with a one hundred dollar bill.

4. I knew from my training and experience that Atlanta, Georgia is known as a drug hub; a city to which drugs may be transported from source cities before subsequent distribution.[2]

5. Prior to Alioto's arrival I conducted a check of a commercial database and a NCIC check on Alioto. The commercial data base search revealed where Alioto resided and gave his California drivers license number. The NCIC check revealed that Alioto was a white male, 5'11" tall, weighing 185 pounds, with brown hair, hazel eyes and was born on October 21, 1977. NCIC records further revealed that Alioto has seven prior drug arrests and three drug convictions. He had a misdemeanor conviction in Sacramento for possession of a controlled substance in 2003; he was sentenced to 36 months probation and 90 days jail. He had a misdemeanor conviction in Fulton County, Georgia for possession of marijuana less than one

---

[1] The flight was originally scheduled to arrive at 1:16 p.m., but it arrived twenty minutes early at 12:56 p.m.

[2] A copy of the United States Department Intelligence Center, National Drug Threat Assessment report identifying Atlanta as a "significant drug distribution hub" which was supplied to claimant as part of discovery is attached hereto as Exhibit A.

Decl. In Opposition to Motion to Suppress
No. 07-5413 MMC                                2

once in 2005 and sentenced to 12 months with credit for time served. Alioto also had a misdemeanor conviction in Lancaster, Texas in 2005 for possession of marijuana (less than two ounces) for which he was held for an undetermined amount of time.

6. I also learned that on May 26, 2007, Alioto was arrested in Myrtle Beach, South Carolina for operating an unregistered vehicle, no proof of ownership, no valid driver's license and speeding. Alioto posted bond in the amount of $668.00 in cash. At the time of his arrest Alioto had in his possession a total of $2,731.00 in cash. Alioto listed his employer or occupation as a family restaurant.

7. On May 30, 2007, Delta Airline flight #611 arrived at gate C40 at approximately 12:56 p.m. I and other agents from DEA Task Force 2 observed Alioto deplane. He was the second passenger to exit Gate C40. Alioto was carrying a brown leather gym bag and a small rolling bag. We maintained foot surveillance as Alioto went through the secured check point exit, proceeded through the baggage claim area and out the airport doors to the Delta Airlines curbside pick-up area. We did not stop Alioto because we wanted to see if he was meeting anyone or had checked a bag we did not know about.

8. I and Task Force Agent ("TFA") Steve Maes approached Alioto and identified ourselves and displayed our law enforcement identification, which contained our photographs. We were not in uniform, but were dressed in casual clothing and we did not display our weapons. There were other plainclothes agents in the area, but they did not approach Alioto or make themselves known to him. They were there for surveillance and for our safety. I advised Alioto that he was not under arrest and was free to go. TFA Maes asked Alioto if he would answer some questions and Alioto said "yes, but my ride will be here shortly." I asked Alioto for identification and Alioto provided a California drivers license, which I examined and returned. TFA Maes asked Alioto about his travel itinerary. Alioto stated that he had flown in from Atlanta, Georgia. He said he had flown to Atlanta on May 25th and then on to Myrtle Beach, South Carolina for the "Black Motorcycle Weekend" on May 26th and returned to Atlanta on May 28th. He did not mention that he had changed his travel plans three times. Alioto appeared nervous to me and his hands were shaking.

9. TFA Maes asked Alioto if he currently had illegal drugs or a large amount of U.S. Currency in his possession. Alioto stated that he had approximately $25,000.00 U.S. Currency in his luggage.[3] Thereafter, Alioto spontaneously told us that his grandfather was a former mayor of San Francisco, his mother was name Joan, and that he had an aunt named Angela. This was surprising since we had not asked any questions about his family or political connections. In my experience individuals who mention political or law enforcement connections in these types of situations often do so in an attempt to obtain preferential treatment or deflect further scrutiny.

10. At approximately 1:09 p.m., a silver 750i BMW with paper tags parked curbside in front of Alioto. Alioto said the BMW was his ride home. TFA Maes asked Alioto for consent to search his luggage for U.S. currency or illegal narcotics. Approximately 5 minutes had elapsed between the time we approached Alioto and the time we requested consent to search his bags. Alioto declined, stating that he was late and his ride was there. I explained to Alioto that we had a reasonable suspicion to believe the luggage contained narcotics or currency that was possible proceeds of narcotics transactions. Alioto asked what the procedures were and what would happen next. I told Alioto that he was still free to go, but that we were temporarily detaining the two pieces of luggage so that a trained narcotics canine could check out the luggage, and if the dog alerted, the agents would seek a search warrant. Alioto stated "Go get the dog."

11. TFA Maes approached the driver of the BMW and explained that Alioto was not under arrest and was not in any trouble. When the driver asked how long the canine dog check would take, TFA Maes explained that it should take about 5 minutes. When asked for his name the driver was reluctant, stated "Joe" and refused to give his last name. The driver stated that he wanted to find a parking space for the BMW and wait until Alioto was through. The driver, later identified as Jonas Teele, drove away. He did not return.[4]

---

[3] Alioto was later found to have approximately $61,000.

[4] Following the consensual encounter I learned that Alioto took a cab from the airport. Jonas Teele did not return for Alioto. The cab driver stated that Alioto was very nervous and requested to be dropped off in Oakland. The cab driver feared that he would be "stiffed" on the fare and denied the request. Alioto then requested to be dropped off anywhere in downtown San Francisco. Alioto did not ask to go to a radio station.

Decl. In Opposition to Motion to Suppress
No. 07-5413 MMC                                      4

12. I immediately called TFA Marty Mahon to respond to the location with his certified narcotics detection canine, "Maximus." I knew that TFA Mahon and Maximus were out of sight inside the baggage area less than 50 feet behind us. Earlier that day I had requested that TFA Mahon and Maximus be in close proximity and on call in the event we needed their services. In less than 5 minutes TFA Mahon and Maximus approached the curb sidewalk where I, TFA Maes, and Alioto were standing with Alioto's bags. Maximus alerted to the two luggage pieces by barking and scratching which indicated to TFA Mahon that the odor of narcotics was emanating from the luggage. "Maximus" is certified to detect heroin, cocaine, marijuana and methamphetamine. TFA Mahon has handled and trained "Maximus" since May of 2001. "Maximus" has successfully located drugs over 300 times in past cases and training.

13. After Maximus alerted to the luggage, Alioto said that the dog had alerted because "legal marijuana" was previously carried inside of the luggage. When asked if he had a medical cannabis card, Alioto replied "no."

14. I asked Alioto if agents could search his luggage. Alioto replied "Go ahead and search the bags. There aren't any drugs in it." I searched the luggage pieces while TFA Maes interviewed Alioto.

15. Alioto told TFA Maes that he currently owns a record company with Jonas Teele called Wash House Records and that he makes approximately $10,000.00 to $15,000.00 a month from the company. Alioto said he sold "five beats" to Lil Jon and "five beats" to Lil Jon's associates. He was unable to provide contact numbers or names for anyone to whom he had sold "beats." He refused to tell us the price of the "beats", stating "the amount of the beats varies." When asked which financial institution he used, Alioto stated that he did not have a bank account and did not believe in banks. Alioto stated that he planned to keep the currency he had at his mother's residence. When asked if he had ever been arrested, Alioto stated that he had only been arrested for vandalism and "this weekend for a suspended DL".

16. I began by searching Alioto's brown leather gym bag. In the main compartment of the leather gym bag I found a white plastic bag which contained numerous large bundles of rubber banded United States Currency. I located a pair of tennis shoes, with one large rubber banded

1  bundle of U.S. Currency in each shoe. As I continued the search I found a grey tennis shoe bag
2  that contained a pair of tennis shoes and two large bundles of U.S. currency bound together with
3  rubber bands.
4      17. I then searched Alioto's small brown rolling bag. While searching the main
5  compartment, I observed two Western Union customer receipts which showed that on May 29,
6  2007, Alioto made a $500.00 payment on account number ************9108 to Capitol One
7  Card Services in Capone, Virginia. On the same date, Alioto made a $700.00 payment on account
8  number ************7515 to Orchard Bank HSBC in Cloud, Oregon.
9      18. I continued to search the main compartment of the rolling bag and found multiple
10 large bundles of U.S. Currency bound together with rubber bands. I also located a pair of tan
11 pants. I found multiple large bundles of U.S. Currency bound together with rubber bands inside
12 both front pockets of the tan pants.
13     19. TFA Maes told Alioto that he was going to seize the currency pending further
14 investigation. Alioto was given a receipt for the money and left the airport in a taxi. Our entire
15 consensual encounter with Alioto had lasted less than approximately 30 minutes.
16     20. I and TFAs Mahon and Maes walked back to our offices in another terminal and at
17 approximately 1:45 p.m. TFA Mahon had his certified narcotic detection canine, "Maximus,"
18 examine defendant $61,505. During a systematic search of the baggage claim area where the
19 currency had been secreted, "Maximus" alerted to the currency which indicated the odor of
20 narcotics emanating from it.
21     21. The denominations of the defendant $61,505 were: 2040 x $20 dollar bills; 1798 x
22 $10 dollar bills; 545 x $5 dollar bills. The packaging and denominations of defendant $61,505 are
23 consistent with those used for, or from, the sale of illegal controlled substances.
24     I declare under penalty of perjury that the foregoing is true and correct. Executed this
25 _16_ day of July, 2007, at Atlanta, Georgia.

WILLIE BYRD
Special Agent
Drug Enforcement Administration

# Exhibit A

# National Drug Threat Assessment



# 2007

National Drug Intelligence Center
U.S. Department of Justice

# Southeast Regional Overview

## Regional Overview

The Southeast Region (SER) encompasses the states of Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee. The region includes three HIDTA programs—Atlanta, Gulf Coast, and parts of the Appalachia HIDTA. In addition, there are 18 U.S. Attorney Districts in the SER. Atlanta is the most significant drug distribution hub in the SER. Mexican DTOs have consolidated their control of the Atlanta cocaine, methamphetamine, and marijuana markets and are using Atlanta as a drug distribution hub to transport narcotics to other drug markets in the Mid-Atlantic, New York/New Jersey, and New England Regions. A significant and growing Hispanic population in the SER enables Mexican DTOs, who dominate the transportation and wholesale distribution of cocaine, methamphetamine, and marijuana in the region, to operate without increased risk of detection. The rates of increase in the Hispanic populations of Alabama, Georgia, North Carolina, Tennessee, and South Carolina from 1990 through 2000 were among the highest in the nation.

## Drug Threat Overview

The availability and abuse of cocaine and methamphetamine pose the most significant drug threat to the SER. Mexican DTOs transport multiton quantities of cocaine to Atlanta annually for local consumption and for further transportation and distribution throughout the country, particularly to southeastern and Mid-Atlantic markets. The distribution and abuse of methamphetamine, particularly ice methamphetamine, rose dramatically in recent years as Mexican DTOs increased their transportation of the drug to the region. Marijuana is widely cultivated and abused throughout the region; a substantial portion is produced in central and eastern Tennessee. Pharmaceuticals, specifically narcotic analgesics such as oxycodone, hydrocodone, and methadone, are being increasingly diverted and abused throughout the region.

ODDs such as GHB, ketamine, and MDMA pose low-level threats to the SER; Canada-based Asian DTOs have emerged as the principal suppliers of MDMA. The drug threat from heroin is limited primarily to parishes around New Orleans.

## Strategic Regional Developments

- Local methamphetamine production in the SER has decreased significantly as a result of an influx of Mexico-produced ice methamphetamine into the region, which has made local production less necessary. Additionally, state restrictions on precursor chemicals have made the manufacture of methamphetamine more difficult, contributing to the decline in local production.

- Asian DTOs, primarily Vietnamese groups, have emerged as the primary transporters and distributors of MDMA and Canadian high potency marijuana throughout the SER, particularly in larger cities such as Atlanta and Charlotte.

- Hurricanes Katrina and Rita caused many traffickers to relocate from New Orleans to nearby states such as Texas, Georgia, and Mississippi in 2005, changing drug trafficking patterns in those states. As New Orleans recovers, displaced traffickers and abusers are gradually returning and reestablishing the city as a major drug trafficking area in the SER.

- The availability of Mexican black tar (MBT) heroin has increased significantly over the last year in North Carolina, South Carolina, and Tennessee, largely on account of the rising dominance of Mexican DTOs. Additionally, rising purity levels of black tar heroin have made the drug more attractive to abusers.

## Variations from National Trends

- Some Mexican DTOs have occasionally sold wholesale quantities of methamphetamine to retailers while the drug is still wet or damp to increase its weight and, therefore, its price. As the drug dries out, it commonly loses 10 to 20 percent of its weight and sometimes as much as 50 percent.

- Asian traffickers are transporting high-grade hydroponic marijuana from Seattle and Canada to markets in the SER via package delivery services or in private and commercial vehicles.

- The rising dominance of Mexican DTOs has increased the availability of MBT heroin in the SER, particularly in North Carolina, South Carolina, and Tennessee—most heroin available east of the Mississippi River is white heroin.

- Wholesale and retail drug networks based in New Orleans that have been disrupted by hurricane evacuations may not fully rebound in the coming year. However, many wholesale distributors have established successful operations in areas outside New Orleans, including Baton Rouge, Lafayette, Shreveport, and Alexandria (LA), and Hattiesburg (MS). As such, when New Orleans recovers, it will very likely be a more prominent regional distribution center, with several outlying markets.

# Cocaine

## Strategic Findings

- Cocaine production estimates for 2005 are significantly higher because of newly discovered coca fields in Colombia.

- South Texas remains the leading entry area for cocaine smuggled into the United States.

- Mexican DTOs have developed Atlanta as a staging area for direct wholesale cocaine distribution to East Coast drug markets.

## Overview

Despite the fact that the highest recorded level of cocaine interdiction and seizure was recorded in 2005—the fifth consecutive record-setting increase—there have been no sustained cocaine shortages or indications of stretched supplies in domestic drug markets. These seemingly inconsistent trends suggest greater source country supply than was previously estimated, an assertion supported by a recent upwardly revised cocaine production estimate for 2005. The movement of cocaine shipments from South America toward the United States, primarily via Mexico, has not abated or noticeably shifted to new routes or conveyance methods despite smugglers' sharply rising losses. Indeed, cocaine trafficking organizations have thus far succeeded in maintaining sufficient cocaine production and subsequent conveyance, primarily to Mexican DTOs who control most domestic wholesale transportation and distribution—a dominance slowly extending eastward.

*Colombia coca eradication has forced farmers into nontraditional coca growing areas:* Sustained and intense coca eradication in Colombia—the source of an estimated 70 percent of the world's cocaine supply—has diminished coca cultivation in traditional growing areas since Colombian cultivation peaked in 2001. In 2005, however, an 81 percent increase in the landmass surveyed by the U.S. government revealed that some coca growers have adapted to eradication efforts by moving out of traditional growing areas and establishing fields in areas not known for large-scale coca cultivation. In the areas surveyed during 2004, coca cultivation declined from 114,100 hectares in 2004 to 105,400 hectares in 2005. But countrywide, cultivation increased because an additional 39,000 hectares of coca was discovered outside the previously surveyed areas. As a result of the discovery of these new coca fields, the estimated amount of pure cocaine that could have been produced in the Andean region increased from 640 metric tons in 2004 to 780 metric tons in 2005 (see Table 1 on page 4). Since these discoveries, a review of previous yearly coca cultivation and cocaine production estimates has commenced; this review may result in previous annual cocaine production estimates being revised upward.

*Coca cultivation in Bolivia and Peru has the potential to increase significantly and to replace some of the decreased cultivation in Colombia:* Cocaine production in Bolivia and Peru is at a much lower level than in Colombia. However, illegal coca cultivation has increased to its highest level in 5 years. Moreover, cultivation in these countries could substantially increase, since both countries possess the potential to cultivate much more coca as was demonstrated in 1995, when the countries were estimated to have cultivated 163,900[2] hectares of coca (99,400 hectares more than was cultivated in 2005). Although increased coca cultivation in Bolivia and Peru would not be sufficient to sustain supplies if cultivation in Colombia were significantly diminished, increasing cultivation in Bolivia and Peru would certainly delay any observable shortages in cocaine supplies in U.S. drug markets.

---

2. Methodologies for estimating coca cultivation have changed since 1995, and using current methodologies would quite likely result in a somewhat higher or lower estimate than that derived in 1995. Nevertheless, there is no question that the amount of coca cultivated in Bolivia and Peru in the mid-1990s greatly exceeds estimates for 2005.

Table 1. Estimated Andean Region Coca Cultivation and
Potential Pure Cocaine Production, 2001–2005

|  | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| **Net Cultivation (hectares)** | 221,800 | 200,750 | 166,300 | 166,200 | 208,500 |
| Bolivia | 19,900 | 21,600 | 23,200 | 24,600 | 26,500 |
| Colombia | 169,800 | 144,450 | 113,850 | 114,100 | 144,000 |
| Peru | 32,100 | 34,700 | 29,250 | 27,500 | 38,000 |
| **Potential Pure Cocaine Production (metric tons)** | 920 | 820 | 675 | 640 | 780 |
| Bolivia | 60 | 60 | 60 | 65 | 70 |
| Colombia | 700 | 585 | 460 | 430 | 545 |
| Peru | 160 | 175 | 155 | 145 | 165 |

Source: Crime and Narcotics Center.

*Record-level cocaine seizures have not forced a shift in cocaine transit routes to the United States or the principal methods of transport:* The amount of cocaine lost or seized in transit toward the United States increased for the fifth straight year in 2005 (see Table 2) to the highest level ever recorded. Most of these seizures occurred in the Eastern Pacific and Western Pacific Vectors, usually while en route to Mexico. In fact, approximately 90 percent of the documented cocaine flow events destined for the United States transited the Mexico–Central America corridor (see Map 5 in Appendix A). Although this percentage may be somewhat inflated because of underreporting in other regions, where there are fewer U.S. counterdrug assets or actionable intelligence, the Mexico–Central America corridor is, nevertheless, the predominant transit route for cocaine destined for the United States. The predominance of this transit route has not diminished and, in fact, has increased over the past 7 years despite consistently increasing seizures of cocaine shipments in this corridor. Moreover, the primary modes of conveyance—go-fast boats and fishing vessels—have not changed even as interdictions, arrests of smugglers, and vessel seizures continue to climb. Nevertheless, some smaller shifts have occurred over the past 3 years (extending Eastern Pacific transportation routes farther offshore, using more decoy vessels, and decreasing use of Colombia-flagged smuggling vessels, instead utilizing vessels from less cooperative countries) in response to law enforcement pressure.

Table 2. Cocaine Lost or Seized in Transit
Toward the United States
in Metric Tons, 2000–2005

| 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| 117 | 141 | 143 | 157 | 197 | 234 |

Source: *Interagency Assessment of Cocaine Movement*.

*Cocaine smuggling into the United States via East Coast, Puerto Rico, and U.S. Virgin Islands POEs has declined to low levels as smuggling via the U.S.–Mexico border, particularly in South Texas, remains very high:* Drug seizure data suggest that the practice of smuggling cocaine shipments directly to East Coast POEs or through Puerto Rico and the U.S. Virgin Islands has decreased since 2000, now accounting for less than 26 percent of all cocaine seizures in the arrival zone (see Table 3 on page 5). During that same period, cocaine seizures at the Southwest Border have fluctuated but have usually remained within a consistent range, now accounting for 74 percent of cocaine seizures in the arrival zone. Seizure data further suggest

Table 3. Cocaine Seizures in the U.S. Arrival Zone, in Metric Tons, 2000–2005

| Arrival Zone Area | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Southwest Border | 23 | 20 | 23 | 15 | 20 | 23 |
| Puerto Rico/U.S. Virgin Islands | 6 | 6 | 2 | 8 | 7 | 4 |
| U.S. East Coast | 14 | 11 | 9 | 9 | 5 | 4 |
| U.S. Other | 0 | 0 | 0 | 0 | 3 | 0 |

Source: *Interagency Assessment of Cocaine Movement.*

that within the Southwest Border area during the 7-month period from October 2005 through April 2006 more cocaine was seized in the South Texas Sector (11,157 kg) than in the Southern California Sector (3,871 kg), Arizona Sector (3,465 kg), or West Texas Sector (793 kg). Seizures made at the Laredo, Hidalgo, and Progresso POEs accounted for over 70 percent of the cocaine seized in the South Texas Sector.

*Mexican DTOs continue to expand their dominance over wholesale cocaine distribution eastward, using Atlanta as a primary distribution hub for East Coast distribution:* Over the past several years, Mexican DTOs have developed cocaine distribution hubs in eastern states to extend their control over wholesale cocaine distributors in East Coast drug markets, slowly supplanting Colombian and Dominican DTOs. Atlanta is the leading cocaine staging and distribution hub developed by Mexican DTOs for cocaine distribution in East Coast drug markets, including those in Florida and New York. Mexican DTOs are also establishing a strong presence in eastern cities such as Cleveland and Columbus (OH) for significant regional distribution. Despite the encroachment of Mexican DTOs, Colombian and Dominican DTOs remain the primary wholesale distributors of cocaine in many large East Coast drug markets, including Boston, Miami, New York City, and Philadelphia, but their control is diminishing. Some Colombian and Dominican organizations in these cities increasingly are employing Mexican DTOs to smuggle cocaine into the United States on their behalf, but they also continue to transport cocaine through the Caribbean, including to Puerto Rico, for subsequent transport to the East Coast.

*Cocaine demand is stable:* Indicators of domestic cocaine demand show that the demand for cocaine in the United States is relatively stable. According to National Survey on Drug Use and Health (NSDUH) data, past year cocaine use (in any form) by individuals 12 and older has not increased or decreased significantly since 2002. NSDUH and Monitoring the Future (MTF) data indicate that past year cocaine use among adolescents has also remained stable during this same period.

## Intelligence Gaps

*Interagency Assessment of Cocaine Movement* (IACM) estimates of the percentage of cocaine moving toward the United States through the Eastern and Central Caribbean most likely are lower than the actual percentage of the total flow (see Map 5 in Appendix A). The number of drug events recorded by the Consolidated Cocaine Database (CCDB)—the basis of IACM flow estimates—is underreported in those areas because there are fewer U.S. counterdrug assets available in the region to provide such reports. The extent of the underreporting currently is undeterminable.